**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

Caption in Compliance with D.N.J. LBR 9004-1(b)

**FAEGRE DRINKER BIDDLE & REATH LLP**
Michael P. Pompeo
600 Campus Drive
Florham Park, New Jersey 07932-1047
(973) 549-7000 (Telephone)
(973) 360-9831 (Facsimile)
michael.pompeo@faegredrinker.com

-and-

Patrick A. Jackson (*pro hac vice*)
Ian J. Bambrick (*pro hac vice*)
Sarah E. Silveira (*pro hac vice*)
222 Delaware Ave. Suite 1410
Wilmington, DE  19801
(302) 467-4200 (Telephone)
(302) 467-4201 (Facsimile)
patrick.jackson@faegredrinker.com
ian.bambrick@faegredrinker.com
sarah.silveira@faegredrinker.com

*Proposed Counsel to the DAMIS Debtors and
Debtors in Possession*

| | |
|---|---|
| In re: | Chapter 11 |
| DAMIS Holdings LLC, *et al.*,[1] | Case No. 26-16439 (CMG) |
| Debtors. | (Jointly Administered) |

## DAMIS DEBTORS' (I) CORRECTIONS, AND (II) SUPPLEMENTAL MEMORANDUM OF LAW IN FURTHER SUPPORT OF, THEIR CASH COLLATERAL MOTION

---

[1] A complete list of the DAMIS Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the DAMIS Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/DAMIS/.  The location of DAMIS Holdings LLC's principal place of business and the DAMIS Debtors' service address in these chapter 11 cases is 50 Quality Street, #110357, Trumbull, CT 06611.

DAMIS Holdings LLC ("DAMIS Holdings") and certain of its affiliates (collectively, the "DAMIS Debtors"), the debtors and debtors in possession in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), hereby file these (i) corrections and (ii) supplemental memorandum of law in support of the *DAMIS Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral; (II) Granting Adequate Protection to Putative Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "Motion").  In further support of the Motion, the DAMIS Debtors respectfully state as follows:

### CORRECTIONS

1.    Pages 9-11 of the Motion included a table of Mortgage Lenders and DAMIS Debtor obligor(s)/pledgor(s) that was based on the DAMIS Debtors' preliminary review of relevant documents and, as such, contained a number of inaccuracies (as well as a few scrivener's errors). A corrected table follows:

| Mortgage Lender | DAMIS Debtor Obligor(s)/Pledgor(s)[2] |
|---|---|
| Bank Iowa | 4200 Park Avenue Leasing LLC; Woodlands Eagle Timber Leasing LLC; DAMIS Holdings LLC, SIMAD Holdings LLC |
| Bank of America, N.A. | 2203 Grand Canal Boulevard Real Estate LLC |
| Bank of Clarke County | 201 Centre Drive Real Estate LLC; 201 Centre Drive Leasing LLC |
| Bank of New Hampshire | 2195 Harlem Road Real Estate LLC; 2195 Harlem Road Leasing LLC; SIMAD Holdings LLC; DAMIS Holdings LLC |
| Busey Bank, an Illinois Banking Corporation | 1101 East Glendale Boulevard Real Estate LLC; 1101 East Glendale Boulevard Leasing LLC; 7335 Gladiolus LLC |

---

[2]    For brevity, (i) this table does not include any obligors or pledgors that are not DAMIS Debtors, and (ii) the DAMIS Debtors identified in this column may be principal obligors (i.e., borrowers), secondary obligors (i.e., guarantors), pledgors of collateral, or some combination of the foregoing.  This table is based on the current state of the Debtor Advisors' review and analysis of the underlying loan and security documents, and the information herein is qualified in its entirety by the actual loan and security documents, which control.

2

| Mortgage Lender | DAMIS Debtor Obligor(s)/Pledgor(s)[2] |
|---|---|
| Easthampton Savings Bank | 12 Cambridge Drive Realty LLC; 12 Cambridge Drive Leasing LLC; 149 Emerald Street Real Estate LLC; 149 Emerald Street Leasing LLC; 11200 West Florissant Avenue Realty LLC; 11200 West Florissant Avenue Leasing LLC |
| Farmers & Merchants State Bank | 2302 Windsong Drive Leasing LLC |
| Fidelity Co-operative Bank | 44 Southpoint Drive Leasing LLC; SIMAD Holdings LLC |
| First Citizens Community Bank | 1000 Acres Holdings, LLC; Stony Creek Operating Co, LLC |
| First Financial Bank | 400 Greens Road Leasing LLC; 400 Greens Road Real Estate LLC; 771 Corporate Drive Real Estate LLC; 771 Corporate Drive Leasing LLC; 2974 Coppercreek Road Leasing LLC; 3413 Tittabawassee Road Leasing LLC; 3413 Tittabawassee Road Real Estate LLC; 4328 Bay Road Leasing LLC; 4328 Bay Road Real Estate LLC; 5707 MacCorkle Avenue Real Estate LLC; 5707 MacCorkle Avenue Leasing LLC; South Loop West Leasing LLC; South Loop West Real Estate LLC |
| First Merchants Bank | 250 Progressive Real Estate LLC; 250 Progressive Leasing LLC; 3385 Newmark Drive LLC |
| First National Bank of McGregor | 2434 South Interstate 35E Real Estate LLC; 2434 South Interstate 35E Leasing LLC; Oklahoma Wilshire Lofts Real Estate LLC; Oklahoma Wilshire Lofts Leasing LLC; SIMAD Holdings LLC |
| First Technology Federal Credit Union | 1600 Eastchase Parkway Real Estate LLC; 1600 Eastchase Parkway Leasing LLC; 2203 Grand Canal Boulevard Real Estate LLC; 2203 Grand Canal Boulevard Leasing LLC; East Hartford Properties Real Estate LLC; East Hartford Properties Leasing LLC; Fairplain Plaza Real Estate LLC; Fairplain Plaza Leasing LLC; Highland Park Partners LLC; SIMAD Holdings LLC; DAMIS Holdings LLC; Belmont Apartment Partners LLC |
| Goba Capital, Inc. | 348 Morris Avenue Real Estate LLC |
| H2 Development, LLC | WG Operatingco LLC; DAMIS Holdings, LLC; SIMAD Holdings LLC |
| Heartland Bank and Trust Company | Matteson Center Leasing LLC; Matteson Center Real Estate LLC; SIMAD Holdings LLC, and DAMIS Holdings, LLC |

3

| Mortgage Lender | DAMIS Debtor Obligor(s)/Pledgor(s)[2] |
| --- | --- |
| Hometown Bank | Turnpike Road Holdings LLC |
| Inland Bank and Trust | 1133 Northwest L Street Leasing LLC; 1133 Northwest L Street Real Estate LLC |
| Kennebec Savings Bank (with Kennebunk Savings Bank as participant) | 45 Commerce Drive Real Estate LLC; 45 Commerce Drive Leasing LLC?; SIMAD Holdings LLC |
| MAX Credit Union | 4800 USH 280 Real Estate LLC; 4800 Leasing 280 Real Estate LLC; DAMIS Holdings, LLC |
| Mizzen Capital, LP and Mizzen Capital II, LP | Rocking Horse Ranch Landco LLC; Rocking Horse Ranch Operatingco LLC; DAMIS Holdings, LLC; SIMAD Holdings LLC; Splashdown Beach Landco LLC; Splashdown Beach Operating Co LLC; SIMAD Venture LLC |
| NBT Bank, National Association | Splashdown Beach Operatingco LLC; Splashdown Beach Landco LLC |
| North Avenue Capital, LLC | 1401 US Highway 49B Real Estate LLC; 1912 Memorial Drive Real Estate LLC |
| Northern Bank & Trust Company | 90 Pleasant Valley Street Leasing LLC; 90 Pleasant Valley Street Real Estate LLC |
| S&T Bank | 2547 Brindle Drive Real Estate LLC; 2547 Brindle Drive Leasing LLC |
| Saratoga National Bank & Trust Company | 194 Washington Avenue Real Estate LLC; 194 Washington Avenue Leasing LLC |
| Sherando Towne Centre LC | WG Operatingco LLC |
| Southern States Bank | 1323 Augusta West Parkway Real Estate LLC; 1323 Augusta West Parkway Leasing LLC |
| The Bank of Greene County | DASMAS Landco LLC |
| TriState Capital Bank | 830 County Road 64 Real Estate LLC; 830 County Road 64 Leasing LLC |
| Visions Federal Credit Union | Rocking Horse Ranch Landco LLC; Rocking Horse Ranch Operatingco LLC |
| Wayne Bank | 1135 East Chocolate Avenue Leasing LLC |

4

| Mortgage Lender | DAMIS Debtor Obligor(s)/Pledgor(s)[2] |
|---|---|
| Windsor Federal Savings and Loan Association | 200 Great Pond Drive Leasing LLC; 200 Great Pond Drive Real Estate LLC; SIMAD Holdings LLC |
| Woodforest National Bank | 4650 Westway Park Boulevard Real Estate LLC; 4650 Westway Park Boulevard Leasing LLC |

2.      In paragraph 34 of the Motion, the DAMIS Debtors noted the Leasehold Mortgages were typically originated at 65%-75% loan-to-value ratio to the purchase price for the Secondary Acquisition, which implied the existence of an equity cushion.  The DAMIS Debtors will *not* be relying on this observation as a blanket argument applicable to all Leasehold Mortgages, because it appears that in at least some instances, the purchase price for the Secondary Acquisition was not based upon, or necessarily indicative of, the fair market value of the acquired assets.

## SUPPLEMENTAL ARGUMENT

3.      At the further interim hearing on July 9, 2026, the DAMIS Debtors will be seeking entry of second interim orders authorizing the use of cash collateral for an additional two weeks, which orders will again will fall in three categories: (i) an order for DAMIS Holdings, (ii) an expected twenty (20) lender-specific orders[3] applicable to one or more DAMIS Debtors where the applicable Mortgage Lender(s) negotiated a form of order with the DAMIS Debtors, and (iii) a "catch-all" order applicable to various DAMIS Debtors for whom the applicable Mortgage Lenders did not negotiate a lender-specific form of order.

4.      The proposed budgets for the second interim cash collateral period (for the weeks ending July 17 and July 24) were filed on July 7, 2026.  Important take-aways regarding these budgets are as follows:

---

[3]    There were eighteen lender-specific interim orders previously entered, and two additional Mortgage Lenders that had been included on the "catch-all" order previously have now come forward to discuss entry of their own lender-specific orders.

- The budgets generally provide for payment of ground rent, where applicable.

- Some of the budgets provide for payment of debt service to the Mortgage Lenders (either interest-only or, in some cases, principal and interest).

- None of the budgets provide for payment of chapter 11 professional fees, thus reserving this issue for the final hearing.

- Thus, with the exception of debt service where applicable, the only disbursements contemplated by these budgets are for the operations of the subject Properties during the further interim period.

5.     In light of the foregoing, the DAMIS Debtors are hopeful that the Mortgage Lenders will consent to the DAMIS Debtors' use of cash collateral for the further interim period on substantially the same terms as in their respective interim orders.  However, for any Mortgage Lenders that do *not* consent, the DAMIS Debtors submit that there are four independent grounds upon which the Court could and should authorize the DAMIS Debtors' continued use of cash collateral without consent during this second interim period,[4] which are discussed below after a threshold observation about standing.

A.     **"Creditors of Creditors" Lack Standing to Object to the Motion**

6.     Several objections to the Motion have been filed by so-called "leasehold tenant creditors" or "fee creditors" (D.I. 188, 371, 374)—i.e., creditors of Non-Debtor Fee Owners—who argue that ground rent owed to Non-Debtor Fee Owners under their ground leases with DAMIS Debtors must be paid under any cash collateral budget in order for that budget to be approved.

7.     Absent from these objections is any explanation what interest *in cash of the DAMIS Debtors* is claimed by these entities, which is critical because only a party with an interest in cash may object and demand adequate protection of such interest under section 363 of the Bankruptcy Code.  *See* 11 U.S.C. §§363(c)(2)(A) (permitting use of cash collateral with the consent of "each

---

[4] ***To be clear, entry of any second interim cash collateral orders upon consent of the applicable secured parties would be authorized under section 363(C)(2)(A) and would not require the Court to reach these arguments.***

entity that has an interest in such cash collateral"), 363(e) (providing for adequate protection "on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee"). The objectors' reasoning seems to be that, because the DAMIS Debtors' cash is used to pay ground rent that they owe to Non-Debtor Fee Owners, who in turn use the cash received as ground rent to service the mortgages owed to these parties, these parties have some kind of indirect interest in cash of the DAMIS Debtors. But this reasoning necessarily rests on the further premise that *the Non-Debtor Fee Owners'* expectancy of receiving rent payments from cash of the DAMIS Debtors somehow gives rise to an "interest" in such cash for purposes of section 363 of the Bankruptcy Code, which is simply not the case. Indeed, were it so, then *any* creditor of a chapter 11 debtor could similarly claim an interest in the debtor's cash, simply by virtue of their expectancy that the debtor would use its cash to pay them, which would expand the concept of an "interest in property" under section 363 beyond recognition.

8. To the extent that these objections are a portent of things to come,[5] the DAMIS Debtors request that the Court overrule them more generally for lack of standing, as it is well established that being a "creditor of a creditor" of a debtor is not sufficient to confer standing to appear and be heard in the debtor's bankruptcy case. *In re Mt. Creek Resort, Inc.*, 616 B.R. 45, 52 (Bankr. D.N.J. 2020) ("[C]reditors of creditors generally lack standing to participate in bankruptcy cases. . . . The Bankruptcy Code does not recognize the terms 'remote creditor or indirect creditor,' nor does this Court."); *In re Lifeco Inv. Grp., Inc.*, 173 B.R. 478, 487 (Bankr. D. Del. 1994) ("I find no statutory or judicial support to conclude that a creditor of a creditor has standing in a bankruptcy case. Indeed, numerous cases state the contrary.").

---

[5] For instance, one of these "leasehold tenant creditors" previously objected to the DAMIS Debtors' motion to file a consolidated list of creditors (D.I. 154).

**B.      There Are Four Independent Grounds for Permitting Further
Interim Cash Collateral Usage Without Consent**

9.      As discussed in the Motion, putative secured parties opposing cash collateral usage have the initial burden of establishing an interest in cash collateral.  *See* 11 U.S.C. § 363(p)(2). And the cash at issue here falls into two conceptual buckets: (i) cash on hand (i.e., in bank deposit accounts) as of the Petition Date, and (ii) cash received post-petition, typically as rents from space tenants for the various Properties.

10.      As noted in the Motion, the DAMIS Debtors are unaware of any deposit account control agreements (DACA) in favor of a putative secured party, which is generally what would be necessary under applicable nonbankruptcy law to perfect a non-possessory security interest in cash on deposit in bank accounts.  Accordingly, the parties having a valid interest in the DAMIS Debtors' cash on hand for purposes of the Motion would be limited to those secured parties who are the banks at which such cash was on deposit as of the Petition Date (and then, only to the extent of such deposits).  To the extent any such parties object to the DAMIS Debtors' use of cash on hand as of the Petition Date to fund the proposed second interim budgets, the DAMIS Debtors will satisfy the requirements for using cash collateral under section 362(c)(2) of the Bankruptcy Code for the reasons discussed in the Motion.

11.      But the DAMIS Debtors do not expect cash on hand as of the Petition Date to be the sticking point.  Rather, they expect that most (if not all) objections to the continued use of cash collateral for the further interim period will be focused on the cash that was received by the DAMIS Debtors earlier this month, primarily as rent from the space tenants for the Properties.  As discussed below, there are four independent conceptual bases on which the Court could, and should, permit the DAMIS Debtors to use such cash for the further interim period in addition to those discussed in the Motion, namely: (i) a limited "equities of the case" waiver under § 552(b) applicable only

8

to the interim budget period, (ii) a recognition that precluding the DAMIS Debtors from using rents that a state-law receiver would be permitted to use for the operation of the Properties would expand the putative secured parties' rights in property by happenstance of bankruptcy, contrary to *Butner* principles, (iii) a recognition that use of post-petition rents for the operation of the Properties does not result in any diminution in the value of the putative secured parties' interest in property as of the Petition Date for which adequate protection would be required, and (iv) a finding that the putative secured parties are adequately protected against any diminution in the value of their interests in property for the reasons set forth in the Motion.

      **(i)**        **A *Limited* "Equities of the Case" Ruling under § 552(b) Is Warranted**

12. As discussed in the Motion, section 552(a) of the Bankruptcy Code establishes a general rule that a security agreement entered into by the debtor prepetition is not sufficient to create a security interest in any property acquired by the debtor's bankruptcy estate post-petition. Section 552(b) establishes an exception to this rule for post-petition property that constitutes proceeds of prepetition collateral, where the prepetition security agreement or applicable law extend such security interest to any after-acquired proceeds of the prepetition collateral. *See* 11 U.S.C. § 552(b)(1) (dealing generally with post-petition proceeds of prepetition collateral) and (2) (dealing specifically with post-petition rents, fees, charges, etc., from hotels, motels, or other lodging properties). This section 552(b) exception is itself subject to a further exception, "*to any extent* that the court, after notice and a hearing and *based on the equities of the case*, orders otherwise." *Id.* (emphasis added).

13. Under section 552(b), the Court has "broad equitable powers in determining the extent to which [a secured party] may maintain its security interest" in post-petition rents. *Johnson v. Edwards Family P'Ship, LP (In re Cmty. Home Fin. Servs.)*, 583 B.R. 1, 107-08 (Bankr. S.D. Miss. 2018) (overruling objection to cash collateral motion, finding that the equities of the case

warranted "a finding that [the secured party's] security interest does not flow to all traceable proceeds generated by [the collateral properties], since they represent, in larger part, the yeoman's work of the Trustee and numerous professionals of the estate"); *see In re Sorrell*, 286 B.R. 798, 810-11 (Bankr. D. Utah 2002) (holding "that § 552(b) gives the Court some flexibility in crafting a payment scheme which does address the 'equities of the case,'" and limiting attachment of secured party's lien on chapter 12 debtors' post-petition crops for purposes of determining treatment of creditor claims under the debtors' plan); *In re Delbridge*, 61 B.R. 484, 490-91 (Bankr. E.D. Mich. 1986) (overruling objection to cash collateral motion, applying equities of the case to limit attachment of prepetition lien on milk generated by dairy farmer post-petition, so as to account for the labor and expenses associated with production of such milk); *In re Crouch*, 51 B.R. 331, 332 ("The purpose behind the 'equities of the case' rule of 11 U.S.C. § 552(b) is, in a proper case, to enable those who contribute to the production of proceeds during chapter 11 to share jointly with pre-petition creditors secured by proceeds.").

14.    To the extent necessary to permit the DAMIS Debtors to use cash collateral for the further interim period, a *limited* "equities of the case" finding under section 552(b) would be warranted.

15.    These cases commenced as a crash filing, as the result of a liquidity crisis brought about by the actions (or inactions, or both) of prior management, which remain to be fully investigated.  Under new independent and professional management, the DAMIS Debtors have worked hard to stabilize their Properties for the benefit of all stakeholders.  They sought and obtained use of cash collateral for an initial interim period to fund the operations of the Properties, while deferring the question of funding of chapter 11 professionals' fees to a later date.  Now for a second interim period, the DAMIS Debtors again seek use of cash collateral to fund operations,

as well as ground rent and debt service where applicable, while again deferring the question of funding of chapter 11 professionals' fees to a later date.  The uses of cash during this second interim period should be non-controversial, as they go directly to the operation and maintenance of the Properties upon which all creditor recoveries (including particularly those of the Mortgage Lenders) will ultimately depend.  The amounts to be paid under the budget for operating expenses will go to the providers of post-petition services or, in some instances, to prepetition creditors where the Court has separately approved such payments as necessary for the preservation of the DAMIS Debtors' bankruptcy estates (e.g., critical vendors).  And at issue for this interim period is *one month's* post-petition rent from space tenants, in the context of a *99-year* ground lease held by the applicable DAMIS Debtors that serves as the collateral for the Leasehold Mortgage holders.  The DAMIS Debtors seek to utilize this one month of rental income in order to preserve the operational status quo for a little while longer, so the DAMIS Debtors can continue investigating the relevant facts and circumstances of these cases and formulating their go-forward strategy with respect to the various Properties.  Thus, the DAMIS Debtors respectfully submit that the equities of the case would clearly support the Court ***ordering that the putative secured parties' prepetition liens do not extend to any rents received by the DAMIS Debtors in July 2026***—in which case, such rents would be unencumbered and available for use by the DAMIS Debtors in the ordinary course of business or in accordance with orders of the Court authorizing such use, as applicable.

  **(ii)**   **Prohibiting Use of Post-Petition Rents to Pay Operating Expenses for the Properties Would Expand the Mortgage Lenders' Property Rights in Bankruptcy in Violation of *Butner* Principles**

  16.  The seminal case of *Butner v. United States*, 440 U.S. 48 (1979) provides the proper starting point for the analysis of the objections of those parties having a collateral assignment of leases/rents.  That case involved a dispute between a bankruptcy trustee and an undersecured mortgagee over the right to post-petition rents.  The bankruptcy court held that the rents belonged

11

to the bankruptcy estate, free and clear of any lien of the mortgagee, because the mortgagee had failed to take the steps required under North Carolina law to establish an interest in the rents.  The Fourth Circuit Court of Appeals affirmed, and the Supreme Court granted *certiorari* to address a circuit split as to what law governs whether a security interest in property extends to rents and profits derived from that property.  A majority of circuits decided the issue by reference to applicable state law; a minority "adopted a federal rule of equity that afford[ed] the mortgagee a secured interest in the rents even if state law would not recognize any such interest until after foreclosure," on the theory that, "since the bankruptcy court has the power to deprive the mortgagee of his state-law remedy, equity requires that the right to rents not be dependent on state-court action that may be precluded by federal law."  *Butner*, 440 U.S. at 53.  The Supreme Court rejected the minority view, and affirmed the Fourth Circuit Court of Appeals, famously reasoning as follows, in pertinent part:

> Property interests are created and defined by state law.  Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.  Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving a windfall merely by reason of the happenstance of bankruptcy.  The justifications for application of state law are not limited to ownership interests; they apply with equal force to security interests, including the interest of a mortgagee in rents earned by mortgaged property.

Id. at 55 (internal quotation marks, citation omitted).

17.     While the applicable state law here depends on the particular Properties at issue (which are presently unknown, because it is not clear whether, and if so which, Mortgage Lenders will be opposed to a further interim extension of cash collateral usage), the DAMIS Debtors understand that in most jurisdictions:

- an assignment of rents provided as security for an underlying obligation is itself treated as a mortgage, rather than an absolute assignment;

- perfection of a collateral assignment of rents requires the appointment of a receiver in a foreclosure action to take charge of the rental property; and

- even where a receiver has been appointed, he holds the property as an arm of the court, and his possession is not that of the mortgagee—thus, the mortgagee has no claim upon the income and profit in the receiver's hands as such, and the receiver is free to use them for the continued maintenance and operation of the property.

18.     To the extent any Mortgage Lenders object to the DAMIS Debtors' further interim use of cash collateral with respect to Properties located in jurisdictions where the law is as described above, sustaining their objection would be violative of *Butner* principles, because it would essentially give them *greater* rights vis-à-vis the post-petition rents *in* bankruptcy than they would have had *outside* of bankruptcy.  As one court has noted:

> The decision in the *Butner* case to the effect that the mortgagee's property rights should be no different just because of the "happenstance of bankruptcy" cuts both ways.  While the mortgagee should not have any *lesser* property interest because of the bankruptcy filing, it would equally violate the *Butner* standard to give the mortgagee *greater* rights in the rentals than it would have absent a bankruptcy filing. . . .
>
> A mortgagee who comes into bankruptcy and asserts a right to control the use of specific rent payments, including ultimately the payment over of such payments to reduce its secured debt, without itself taking over possession and operation of the premises . . . arguably would in fact be given greater rights than otherwise would obtain absent a bankruptcy.

*In re Rancourt*, 123 B.R. 143, 150 (Bankr. D.N.H. 1991).

**(iii)     The Bankruptcy Code Does Not Require Adequate Protection of Post-Petition Rents, Which May Be Used to Pay Chapter 11 Administrative Expenses**

19.     Judge Wedoff's thorough and well-reasoned opinion in *In re Addison Properties Limited Partnership*, 185 B.R. 766 (Bankr. N.D. Ill. 1994), is directly on point.  In that case, a chapter 11 debtor moved for approval of a payment of a post-petition retainer to its law firm from

13

rents collected post-petition.  Both the rents and the underlying real property were encumbered by the liens of three prepetition secured creditors.  One secured creditor was oversecured.  Another was at least partially secured, but it was not clear by how much.  The other was either partially secured or completely undersecured.  The undersecured creditors objected to the debtor's proposed use of cash collateral, arguing that each receipt of net proceeds by the debtor post-petition resulted in a new secured claim under section 506(a) of the Bankruptcy Code, which was itself entitled to adequate protection.  The result, they argued, was that there were no funds available to the debtor, since all of the cash was needed to adequately protect their increasing secured claims and, once a sufficient amount of rent had been collected to fully secure such claims, their right to interest and costs under section 506(b) of the Bankruptcy Code.  *Addison Properties*, 185 B.R. at 776-78 (describing the "continuous valuation" approach to secured claims under section 506(a)).

20.     The debtor argued—consistent with the apparent weight of authority at the time— that, because section 502(b) of the Bankruptcy Code provided for the allowed amount of claims to be determined as of the petition date, and section 506(a) provided for allowed claims secured by an interest in property of the estate to be bifurcated into secured and unsecured components, the value of a secured creditor's interest in property of the estate for all purposes was fixed as of the petition date.  The result, the debtor argued, was that, so long as the value of the underlying real property collateral remained constant, post-petition rents were not needed to provide adequate protection and could be used for other purposes, such as paying the debtor's professionals and its obligations under a chapter 11 plan.  *Addison Properties*, 185 B.R. at 771 (describing the "single valuation" approach to secured claims under section 506(a)).

14

21.    After a thorough analysis, Judge Wedoff rejected both sides' arguments as inconsistent with the applicable provisions of the Bankruptcy Code, and instead adopted a "dual valuation" approach to secured claims, whereby:

> (1) *For purposes of adequate protection, the claim of the secured creditor is fixed as of the date of the filing. [Post-petition rents] increase the collateral securing that claim, but do not increase the claim for purposes of adequate protection. Accordingly, if the underlying collateral is not declining in value or at risk of declining in value, the additional cash collateral may be used by the debtor to pay administrative expenses, as well as to maintain or improve the underlying collateral or to make payments on the creditor's claim. . . .*

> (2) At confirmation, the secured claim is revalued. The total claim is reduced by any payments made by the debtor, and the claim is reappraised. Any [post-petition rents] that have not been expended by the debtor, and are not necessary to pay expenses of preservation under Section 506(c), increase the amount of the secured claim. Any appreciation in the value of the underlying collateral also increases the secured claim.

> (3) If the collateral package at the time of confirmation exceeds the amount of the creditor's total prepetition claim, the creditor is entitled to interest and costs under Section 506(b) to the extent of the surplus.

*Addison Properties*, 185 B.R. at 784 (emphasis added).

22.    The starting point for Judge Wedoff's analysis was the "well established" proposition that payment of administrative expenses using cash collateral is permitted so long as the secured creditor's interests are adequately protected. *Addison Properties*, 185 B.R. at 769 (citing *In re James Wilson Assocs.*, 965 F.2d 160, 171 (7th Cir. 1992) (affirming authorization of the use of rents to pay professional fees where the secured creditor's interest was adequately protected)).  While the nature of the interest that is entitled to adequate protection "was once in substantial doubt," he noted, the Supreme Court's decision in *United States Savings Association of Texas v. Timbers of Inwood Forest Associates*, 484 U.S. 365 (1988), "established that 'adequate

15

protection' is meant only to assure that a secured creditor does not suffer a decline in the value of its interest in the estate's property, rather than to compensate the creditor for the bankruptcy-imposed delay in enforcing its rights in that property." *Addison Properties*, 185 B.R. at 769. Thus, the ultimate question raised by the debtor's motion was whether the payment of the retainer would "cause or threaten a decline in the value of the interests of the objecting secured creditors in the property of the debtor's estate." *Id.* at 770. He concluded it would not.

23.     He began by noting the Bankruptcy Code provisions that "bear on the protectable interest of a secured creditor, holding both a mortgage and an assignment of rents, in property of the estate," to wit: (i) section 506(a), which bifurcates undersecured claims into secured and unsecured portions, (ii) section 506(c), which "has the effect of reducing the amount of collateral that secures a creditor's claim" by permitting surcharge of the collateral for costs of preservation, (iii) section 552(b), which "has the effect of increasing the amount of collateral that secures a claim" by permitting a prepetition lien to attach to property acquired by the bankruptcy estate after commencement of the case under certain circumstances, and (iv) section 506(b), which allows the amount of a secured claim to be increased by postpetition interest and fees to the extent that the collateral value exceeds the secured claim. *Addison Properties*, 185 B.R. at 770-71.

24.     Judge Wedoff concluded the "continuous valuation" approach advanced by the objecting secured creditors was flawed for four reasons. First, "with no apparent justification," it deviated from the principle, well established both in the legislative history of section 506(a) and the case law, that adequate protection was "designed to safeguard the value of a creditor's collateral *at the time of the filing of the bankruptcy*." *Addison Properties*, 185 B.R. at 779-80 (emphasis added). Second, it would create "highly questionable results" in cases where the property securing a claim fluctuates in value, by producing a "ratchet effect" whereby "every increase in the asset

16

value above the prior highest value requires adequate protection," which "dramatically enhances the rights of secured creditors [by] allowing them to demand the upside of any fluctuation in collateral value while being protected from any downside movements." *Id.* at 780-81. Third, it would also be problematic when fixed assets securing a claim remain stable, but produce fluctuating amounts of proceeds (as in a cyclical business), because "cash that comes into the business at each point in time [would] create[] a new, higher, secured claim" and "if there is a cash shortfall in any month, the debtor must provide new adequate protection, on penalty of relief from stay." *Id.* at 781-83. Fourth, it would increase the administrative burden on bankruptcy estates, by "provid[ing] the secured creditor with an incentive to measure every slight increase in value, with the potential for an adequate protection demand in the event that there is ever a decrease from the new, higher level," which would require the estate "to bear the cost of responding to new values claimed by the secured creditor, and, if the creditor's claim ever becomes oversecured, . . . to bear the costs of the creditor's appraisals as well." *Id.* at 783 (citing *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 164 (1946) (noting that accrual of post-petition interest on claims in bankruptcy was prohibited to avoid a similar problem, i.e., "the administrative inconvenience of continuous recomputation of interest causing recomputation of claims")).

25.    Judge Wedoff found the "single valuation" approach was also flawed, in that it was contradicted by the language in section 506(a) of the Bankruptcy Code providing for valuation of a secured claim "'in light of the purpose of the valuation and of the proposed disposition or use of [the collateral]'" and "'in conjunction with any hearing on such disposition or use or on a plan affecting [the] creditor's interest.'" *Addison Properties*, 185 B.R. at 775 (quoting 11 U.S.C. § 506(a)). It was also inconsistent with the legislative history of section 506(a), which clearly

17

provided that a valuation of a secured claim for adequate protection purposes would not be binding on the debtor or the secured creditor for plan confirmation purposes. *Id.*

26.     In sum, Judge Wedoff concluded that both the single valuation approach and the continuous valuation approach "give[] inadequate weight to the requirement of Section 506(a), reinforced by the legislative history, that valuation of secured claims for purposes of confirmation is a distinct process from earlier valuation for purposes of determining adequate protection," reasoning:

> The single valuation approach errs by assuming that the value of a secured claim for adequate protection, at the beginning of the case, constitutes the value of the claim at confirmation. The continuous valuation approach errs by assuming that, because changes in the value of collateral during bankruptcy should be considered for confirmation, these changes must also be considered for adequate protection.

*Addison Properties*, 185 B.R. at 784. The practical effect of either approach would be to tilt the balance of power dramatically in favor of debtors (under the single valuation approach, by providing perverse incentives, and an opportunity, for the debtor to delay administration of its case to bootstrap payment of the secured claim using post-petition rents), or secured creditors (under the continuous valuation approach, by providing them a de facto veto right over the entire restructuring process). *Id.* at 773, 778. The dual valuation approach, by contrast, gives full effect to section 506(a) of the Bankruptcy Code, and yields a balanced process that is not weighted in favor of debtors or secured creditors: "Debtors are likely to have the funds necessary to meet the administrative expenses of their bankruptcy, but they cannot reduce the creditor's secured claim with funds accumulated through delay." *Id.* at 784.

27.     It does not appear that this Court has addressed the issues presented by *Addison Properties*, though at least one bankruptcy court in Philadelphia has endorsed Judge Wedoff's dual valuation approach. *In re Duval Manor Assocs.*, 191 B.R. 622 (Bankr. E.D. Pa. 1996) ("The Court

agrees with the Addison Court's reasoning, and accordingly adopts the dual valuation approach as its own herein."). Under this approach, the DAMIS Debtors would be permitted to use post-petition rents to fund operating expenses for the Properties, and the amount of rents on hand at the time of plan confirmation would inform the valuation of the applicable secured parties' secured claims for plan confirmation purposes.

 **(iv)**   **To the Extent Adequate Protection is Required, It is Provided under the Proposed Forms of Order and Budgets**

28. To the extent adequate protection of any interest in post-petition rents is required, the Court could and should find that it is being provided by the Debtors' proposed forms of order and budgets, for the reasons set forth in the Motion and for the additional reasons that (i) payment of ground rent, where applicable, serves as additional adequate protection for Leasehold Mortgage holders having security in the ground lease, and (ii) debt service payments, where applicable, serve as additional adequate protection.

## CONCLUSION

WHEREFORE, the DAMIS Debtors respectfully request entry of appropriate interim and

final orders granting the relief requested in the Motion and such other and further relief as is just

and proper.

Dated: Florham Park, New Jersey
July 8, 2026

**FAEGRE DRINKER BIDDLE & REATH LLP**

*/s/ Michael P. Pompeo*
Michael P. Pompeo
600 Campus Drive
Florham Park, New Jersey 07932-1047
(973) 549-7000 (Telephone)
(973) 360-9831 (Facsimile)
michael.pompeo@faegredrinker.com

-and-

Patrick A. Jackson (*pro hac vice*)
Ian J. Bambrick (*pro hac vice*)
Sarah E. Silveira (*pro hac vice*)
222 Delaware Ave. Suite 1410
Wilmington, DE  19801
(302) 467-4200 (Telephone)
(302) 467-4201 (Facsimile)
patrick.jackson@faegredrinker.com
ian.bambrick@faegredrinker.com
sarah.silveira@faegredrinker.com

*Proposed Counsel to the DAMIS Debtors and
Debtors in Possession*