**Exhibit A**

Case 26-16439-CMG    Doc 490-1    Filed 07/20/26    Entered 07/20/26 16:42:59    Desc
Exhibit A    Page 1 of 27

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| |
|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY** |
| Caption in Compliance with D.N.J. LBR 9004-1(b) |
| **FAEGRE DRINKER BIDDLE & REATH LLP**<br>Michael P. Pompeo<br>600 Campus Drive<br>Florham Park, New Jersey 07932-1047<br>(973) 549-7000 (Telephone)<br>(973) 360-9831 (Facsimile)<br>michael.pompeo@faegredrinker.com<br><br>-and-<br><br>Patrick A. Jackson (*pro hac vice*)<br>Ian J. Bambrick (*pro hac vice*)<br>Sarah E. Silveira (*pro hac vice* pending)<br>222 Delaware Ave. Suite 1410<br>Wilmington, DE  19801<br>(302) 467-4200 (Telephone)<br>(302) 467-4201 (Facsimile)<br>patrick.jackson@faegredrinker.com<br>ian.bambrick@faegredrinker.com<br><br>*Proposed Counsel to the DAMIS Debtors and*<br>*Debtors in Possession* |

| | |
|---|---|
| In re:<br><br><br>DAMIS Holdings LLC, *et al.*,[1]<br><br>    Debtors. | Chapter 11<br><br>Case No. 26-16439 (CMG)<br><br>(Jointly Administered) |

**DECLARATION OF PERRY MANDARINO,**
**CHIEF RESTRUCTURING OFFICER OF THE DAMIS DEBTORS,**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

---

[1] A complete list of the DAMIS Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the DAMIS Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/DAMIS/.  The location of DAMIS Holdings LLC's principal place of business and the DAMIS Debtors' service address in these chapter 11 cases is 50 Quality Street, #110357, Trumbull, CT 06611.

Pursuant to 28 U.S.C. § 1746, I, Perry Mandarino, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

1. I am Head of Restructuring and a Senior Managing Director at B. Riley Securities, Inc. ("B. Riley"), resident in its office located at 299 Park Avenue, New York, NY 10171. I was appointed as Chief Restructuring Officer (the "CRO") for the above-captioned debtors and debtors in possession (collectively, the "DAMIS Debtors") on June 4, 2026. B. Riley was originally retained as the financial advisor to both the DAMIS Debtors and the SIMAD Debtors (as defined below) on May 28, 2026, but has served as financial advisor solely to the DAMIS Debtors since the Court's determination to separately administer the chapter 11 cases of the DAMIS Debtors and the SIMAD Debtors.

2. I have approximately thirty-five years of restructuring experience, most of which has involved corporate restructuring transactions. Prior to B. Riley, I was a Partner and Leader of the Business Recovery Services Practice at PricewaterhouseCoopers LLC, a financial advisory and accounting firm with numerous offices throughout the country. Before then, I was Senior Managing Director at Traxi LLC beginning in April 2002. Prior to April 2002, I was a partner at Arthur Andersen LLP. I received a Bachelor of Science in Accounting from Seton Hall University in 1987. Throughout my career I have advised hundreds of debtors, lenders and other stakeholders on numerous restructuring transactions in complex chapter 11 cases. I have served in various roles in the following chapter 11 cases: (a) as chief restructuring officer in (i) *In re Apple Tree Life Sciences, Inc., et al.*, Case No. 25-12177 (Bankr. D. Del. 2025) (LSS), (ii) *In re Hoop Holdings, LLC*, Case No. 08-10544 (Bankr. D. Del. 2008) (BLS), and (iii) *The MIIX Group Inc., et al.*, Case No. 04-13588 (Bankr. D. Del. 2004) (MFW); (b) as chapter 11 trustee in *In re New York Crane & Equipment Corp., et al.*, Case No. 16-40043 (Bankr. E.D.N.Y. 2016) (CEC); and (c) as examiner

2

in (i) *In re Polaroid Corp., et al.*, Case No. 01-10864 (Bankr. D. Del. 2001) (PJW) and (ii) *In re Summit Global Logistics, Inc., et al.*, Case No. 08-11566 (Bankr. D.N.J. 2008) (DKS).  I have also served as financial advisor and investment banker in numerous cases, including many in the District of New Jersey.  In addition to this experience, I have been involved in the management of certain principal positions for affiliates of B. Riley Financial, Inc.

3.      Since I was engaged as CRO by the DAMIS Debtors, I have been working diligently with the DAMIS Debtors' management and proposed restructuring counsel, Faegre Drinker Biddle & Reath LLP ("Faegre Drinker," and, together with B. Riley, the "Debtor Advisors") other professionals to understand, analyze, and assume operational control over the DAMIS Debtors' business and operations.  I now have full operational control over the DAMIS Debtors and their business.

4.      I am over the age of 18 years, and if called upon to testify, I would testify competently to the facts and opinions set forth in this declaration (this "Declaration").  Except where otherwise indicated, all statements in this Declaration are based upon (a) my personal knowledge, belief, or opinion, (b) information learned from my review of the DAMIS Debtors' records maintained in the ordinary course of their business, (c) information supplied to me and/or verified by the DAMIS Debtors' employees or advisors working directly with me or under my supervision, direction, or control, and/or (d) my knowledge, skill, education, experience, and/or training concerning financial restructurings, and I am competent to testify to the information contained herein.[2]

---

[2] Due to the exigent nature of the circumstances in which the Debtors commenced the Chapter 11 Cases, certain of the information set forth in this Declaration was obtained through publicly accessible sources concerning the DAMIS Debtors.

3

5.      On June 4, 2026 (the "Petition Date"), each of the DAMIS Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of New Jersey (this "Court").  The DAMIS Debtors are authorized to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or an examiner.  The above-referenced chapter 11 cases (the "Chapter 11 Cases") are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b).  D.I. 35.

6.      In anticipation of an impending liquidity shortfall that would have rendered them incapable of continuing to operate in the ordinary course, the DAMIS Debtors filed the Chapter 11 Cases in order to preserve and maximize the value of their assets and to provide a centralized forum to resolve any and all claims and disputes related thereto.  The DAMIS Debtors had not undertaken, much less completed, any contingency-preparation efforts before commencing the Chapter 11 Cases.  As such, since the Petition Date, the Debtor Advisors have been working around the clock and conferring with various parties in interest to develop a more thorough understanding of the DAMIS Debtors' financial condition, business operations, near-term obligations, and liquidity needs.  Much of the information required to effectively administer the Chapter 11 Cases, however, remains out of reach or otherwise incomplete as of the date of this Declaration.  Due to the recent engagements of both B. Riley and Faegre Drinker, the Debtor Advisors have so far had limited visibility into the DAMIS Debtors' financial dealings and their overall operations.  As part of my engagement, I and the Debtor Advisors will continue to work diligently over the weeks and months ahead to investigate these issues, verify key information provided by the DAMIS Debtors' employees, closely analyze the DAMIS Debtors' books and records, and solicit input from parties

4

in interest where necessary or prudent. To assist with these efforts and ensure that decision-making remains disinterested and transparent throughout the Chapter 11 Cases, the DAMIS Debtors appointed two Independent Directors (as defined below) immediately prior to the Petition Date.

7. Additionally, in the coming weeks, I intend to cause the DAMIS Debtors to engage a qualified firm to provide independent forensic accounting services in order to develop a clearer picture of prepetition transactions carried out by the DAMIS Debtors, including any and all intercompany transactions, both among the DAMIS Debtors and between the DAMIS Debtors and the SIMAD Debtors, their non-debtor affiliates, and the Shabsels Brothers (as defined below). To the extent that information uncovered through this process requires additional disclosure to the Court and parties in interest, I intend to supplement this Declaration.

8. I submit this Declaration to assist the Court and parties in interest in understanding the circumstances that compelled the filing of the Chapter 11 Cases and in support of the petitions and the pleadings seeking various forms of "first day" relief (the "First Day Motions") that the Debtors have filed to minimize the adverse effects of the Chapter 11 Cases on their operations. This Declaration proceeds in five parts: Part I provides a brief overview of the DAMIS Debtors' business and operations. Part II describes the DAMIS Debtors' capital structure. Part III then details the events and circumstances preceding the Chapter 11 Cases. Next, Part IV offers an overview of the DAMIS Debtors' primary objectives in the Chapter 11 Cases. Finally, Part V provides evidentiary support for the First Day Motions and the relief sought therein.

## I. The DAMIS Debtors' Business Operations.

### A. Overview of the DAMIS-SIMAD Enterprise.

9. The DAMIS Debtors are indirect subsidiaries of SIMAD Holdings, Ltd. (the "Parent Company"), a holding company organized under the laws of the British Virgin

Islands. Michael Shabsels and David Shabsels (the "Shabsels Brothers") are the ultimate equity

holders of the Parent Company and its various subsidiaries and affiliates (collectively,

the "DAMIS-SIMAD Enterprise"), which comprises: (a) the DAMIS Debtors, (b) certain affiliates

of the DAMIS Debtors that own and operate summer camps (the "SIMAD Debtors"), whose

chapter 11 cases are being separately administered by the Court under Case No. 26-16388 (CMG),

and (c) certain non-debtor affiliates. Put simply, the core business of the DAMIS-SIMAD

Enterprise consists of acquiring, leasing, and operating a highly diversified portfolio of real estate

holdings, buildings, and related assets across the United States.

**B.     The DAMIS Debtors' Assets.**

10.     The DAMIS Debtors own, lease, and operate various buildings, improvements,

personal property, leases, leasehold interests, and related assets (collectively,

the "Leasehold Assets") located on or associated with real property with respect to which the

DAMIS Debtors either (a) own fee simple interests (the "Owned Properties"), or (b) own rights of

possession and leasehold interests, subject to ground leases (the "Leased Properties," and, together

with the Owned Properties, the "Properties," and the Properties, together with the Leasehold

Assets, collectively, the "Assets").

11.     The DAMIS Debtors own or lease approximately fifty-five (55) Properties located

in Alabama, Arkansas, California, Connecticut, Florida, Georgia, Illinois, Indiana, Iowa,

Kentucky, Maine, Massachusetts, Michigan, Missouri, New Hampshire, New Jersey, New York,

Ohio, Oklahoma, Pennsylvania, Texas, Virginia, and West Virginia, and encompass, among

other things:

> (a)     ***hotels and lodgings***, such as Rocking Horse Ranch Resort, an all-inclusive
> family resort located roughly 90 miles north of New York City, where guests
> enjoy a range of indoor and outdoor activities;

6

    (b)    *leisure properties*, such as SplashDown Beach, a waterpark located in New York's Hudson Valley;

    (c)    *multifamily properties*, consisting mainly of apartment buildings with units across a range of affordable and high-end price points;

    (d)    *retail properties*, which generally comprise shopping complexes, often anchored by large, brand-name commercial tenants;

    (e)    *office buildings*, which house a variety of business tenants;

    (f)    *medical offices*, occupied by dental practices and surgical oncology facilities, among others; and

    (g)    *industrial properties*, such as warehouses and manufacturing facilities.

**C.    Acquisitions and Ownership of the Assets.**

12.    The DAMIS Debtors' overall Asset portfolio includes a mix of Properties that are either owned outright by the DAMIS Debtors or are owned subject to Ground Leases (as defined below) between the DAMIS Debtors and the applicable Non-Debtor Fee Holder (as defined below). As of the date of this Declaration, the Debtor Advisors are not in a position to provide an informed estimate of the value of the Properties. The Property values that supported the issuance of the Fee Mortgages, the Leasehold Mortgages, and the Non-Debtor Fee Mortgages (each as defined below), as well as other financial transactions and relationships, remain the subject of active investigation by the Debtor Advisors.

    *1.    Owned Properties*

13.    Upon information and belief, the DAMIS Debtors hold fee interests in eighteen (18) Owned Properties located in Alabama, Arkansas, California, Connecticut, Florida, Georgia, Indiana, Massachusetts, New York, Ohio, Oklahoma, Tennessee, and Virginia. The Owned Properties, acquired between 2016 and 2022, consist of hotels, industrial properties, medical offices, multifamily apartment buildings, offices buildings, retail properties, and mixed-use properties. The DAMIS Debtors are obligated on mortgages (each, an "<u>Fee Mortgage</u>") that are secured by the Owned Properties.

## 2. *Leased Properties*

14.     Upon information and belief, fee simple interests in the Leased Properties are held by non-debtor entities (each, a "Non-Debtor Fee Holder") that are not controlled by (but may constitute affiliates of) the DAMIS Debtors.  Upon information and belief, many of the Non-Debtor Fee Holders are entities established and owned directly or indirectly either by: (a) the Shabsels Brothers; (b) trusts established for the benefit of the Shabsels Brothers' family members; (c) Leeton Real Estate, Inc., an entity controlled by Mark Graham, a longstanding business partner of the Shabsels Brothers; or (d) some combination of the foregoing parties.

15.     In most cases, the DAMIS Debtors' interests in the Leased Properties would arise through a process substantially similar in all material respects to the following sequence of steps. First, the DAMIS Debtors would identify a target property, generally comprising a mix of real property, buildings, improvements, mineral rights, timber rights, personalty, existing leases, and related assets (the "Target Property").  Next, the Non-Debtor Fee Holder would enter into a purchase contract (the "Purchase Agreement") with the third-party owner of the Target Property— say, for the sake of illustration, for a purchase price of $10 million (the "Initial Acquisition").  The Non-Debtor Fee Holder would then enter into separate sale agreements (the "Sale Agreements," and the transactions embodied therein, the "Secondary Acquisitions") with two DAMIS Debtor entities: one (a "LandCo Debtor") that would contract to purchase the ownership interests in the buildings, improvements, personalty, and other rights and interests associated with the Target Property, in each case subject to a 99-year ground lease (each, a "Ground Lease"); and another (an "OpCo Debtor") that would contract to purchase the rights under all pre-existing tenant leases, space leases, and similar leases and interests connected to the Target Property, also subject to the

8

Ground Lease.[3]  The aggregate amount payable to the Non-Debtor Fee Holder under the Sale

Agreements would be less than the amount payable by the Non-Debtor Fee Holder under the

Purchase Agreement with the seller of the Target Property—say, again for the sake of illustration,

$8 million.

16.     With the Purchase Agreement and Sale Agreements in place, the DAMIS Debtors

would obtain acquisition financing secured by assets to be acquired in the Secondary Acquisition

(a "Leasehold Mortgage"), which typically had a loan-to-value ratio in the range of 65–75% of the

purchase price for the assets—so, in this illustration, between $5.2 million and $6 million.[4]

Separately, the Non-Debtor Fee Holder would obtain acquisition financing secured by the fee

simple interest in the Target Property (a "Non-Debtor Fee Mortgage"), in an amount typically

equal to 40% of the purchase price for the Target Property—so, in this illustration, $4 million.

When possible, the Non-Debtor Fee Mortgage would be provided by a traditional, long-term

mortgage lender; typically, however, the Non-Debtor Fee Mortgage would be provided by a

short-term bridge lender, with the goal of replacing the bridge loan with a permanent mortgage at

some point after the transaction closed.  (For the avoidance of doubt, the Non-Debtor Fee

Mortgages do not constitute obligations of the DAMIS Debtors.)

17.     Closing of the Initial Acquisition and the Secondary Acquisitions typically

occurred simultaneously, so that the proceeds of the Non-Debtor Fee Mortgage and the Leasehold

Mortgage could be utilized to pay the purchase price for the Target Property.  After closing, the

fee interest in the real property was owned by the Non-Debtor Fee Holder, the building and

---

[3] Upon information and belief, in some cases, DAMIS Holdings LLC served as the purchaser in the Secondary Acquisitions, and the borrower under the Leasehold Mortgage, and subsequently assigned its interests in in all applicable agreements to the DAMIS Debtor entities that would eventually serve as the LandCo Debtor and the OpCo Debtor.  The transactions described in this section are for illustrative purposes only.

[4] The LandCo Debtor and the OpCo Debtor are generally the borrowers under each Leasehold Mortgage, and other DAMIS Debtors, their non-debtor affiliates, the Shabsels Brothers, or a combination thereof serve as guarantors or pledgors thereunder.

improvements were owned by the LandCo Debtor subject to the Ground Lease with the Non-Debtor Fee Holder, and the leases with the space tenants were owned by the OpCo Debtor, also subject to the Ground Lease. Rent receipts by the LandCo Debtor and/or the OpCo Debtor were used to service the Leasehold Mortgage, and ground rent received by the Non-Debtor Fee Holder from the LandCo Debtor and the OpCo Debtor under the Ground Lease was used to service the Non-Debtor Fee Mortgage.

**D. The DAMIS Debtors' Operations.**

18. The DAMIS Debtors' business centers on the acquisition, operation, management, development, and leasing of income-generating commercial, residential, and industrial real estate and related assets. The DAMIS Debtors' primary revenue source consists of base rental income generated from leases in effect at both the Owned Properties and the Leased Properties. The DAMIS Debtors' business also produces resort and lodging revenues and ancillary revenues derived from facility rentals, payments for parking at the Properties, and sales of food and beverages.

**E. The DAMIS Debtors' Workforce and the Property Managers.**

19. The DAMIS Debtors directly employ a limited number of individuals who generally serve in corporate functions that support the DAMIS Debtors' business as a whole, including legal, operations management, accounting, and treasury. These employees include personnel who are intimately familiar with the DAMIS Debtors' business and possess the unique skills and experience necessary to perform a wide range of functions that are critical to the DAMIS Debtors' ability to operate in the ordinary course of business.

20. To supplement their workforce, the DAMIS Debtors rely on the services of various property managers (the "Property Managers") and their employees to oversee day-to-day

operations at the Properties. The Property Managers perform a range of services that are indispensable to the DAMIS Debtors' ordinary-course operations, including, among other things: (a) managing the Properties; (b) collecting rent from the DAMIS Debtors' tenants and facilitating deposits in the DAMIS Debtors' operating accounts; (c) overseeing maintenance of the Properties and arranging for any emergency repairs that might be necessary; and (d) coordinating with, and making payments on behalf of the DAMIS Debtors to, third-party service providers such as security firms, cleaning crews, utility providers, insurance carriers, and other vendors and suppliers.

## II.    The DAMIS Debtors' Capital Structure.[5]

### A.    Mortgage Obligations.

21.    On the basis of information available to and reviewed by me and the Debtor Advisors, I believe that the DAMIS Debtors' prepetition secured indebtedness under the Fee Mortgages and the Leasehold Mortgages (together, the "Mortgages," and the Mortgages, together with all agreements, deeds of trust, financing statements, and other documents and instruments related thereto, collectively, the "Mortgage Loan Documents") consists of an aggregate principal amount of approximately $466 million in outstanding obligations (the "Mortgage Obligations") owed to various lenders (collectively, the "Mortgage Lenders"). As of the date of this Declaration, the Debtor Advisors continue to review title reports obtained for each Property and its associated Assets in order to ascertain the current holders and servicers of all Mortgages, as well as all other recorded liens against the Properties and the Assets.

---

[5] For the avoidance of doubt, the DAMIS Debtors will disclose all indebtedness in their schedules of assets and liabilities, which they expect to file in the coming months. The information set forth in this section is preliminary and remains subject to further review and revision by the DAMIS Debtors. Any description of indebtedness or parties as "secured" is for ease of reference only and is not intended, nor should it be construed, as an admission as to the existence, validity, or extent of any lien or security interest in property of the DAMIS Debtors' estates. The DAMIS Debtors reserve all rights as to such issues, as well as to the validity and amount of any putative secured party's claim.

**B.      Small Business Association Loans.**

22.      Following the onset of the COVID-19 pandemic, fourteen (14) of the DAMIS Debtors obtained secured financing pursuant to the Economic Injury Disaster Loan program (each loan provided thereunder, an "EIDL Loan") administered by the U.S. Small Business Administration.  The EIDL Loans, issued in principal amounts ranging from approximately $35,000 to $180,000, generally mature thirty (30) years from the date of issuance and are secured by all of the borrower's tangible and intangible personal property, among other things.  The DAMIS Debtors estimate that approximately $1.1 million in obligations under the EIDL Loans remained outstanding as of the Petition Date.

**C.      Merchant Cash Advances.**

23.      Certain of the DAMIS Debtors are parties to readily accessible, revenue-based financing arrangements that serve as an alternative to traditional lending options, commonly referred to as merchant cash advances (each, an "MCA").  Under these arrangements, providers of MCAs (the "MCA Lenders") advance short-term funding that the DAMIS Debtors use to satisfy working-capital needs as they arise in the ordinary course of business.  Generally, the agreements governing the MCAs (the "MCA Agreements") entitle the MCA Lenders to contractually determined percentages of specific DAMIS Debtors' receivables, which the MCA Lenders acquire at a significant discount in exchange for their willingness to provide MCAs.  The MCA Lenders recover amounts due from the DAMIS Debtors on account of the MCAs (the "MCA Obligations") through periodic withdrawals from the DAMIS Debtors' bank accounts, which occur on a continual basis until the DAMIS Debtors have repaid the MCA Obligations in full.  The MCA Obligations are often guaranteed by numerous DAMIS Debtor entities, SIMAD Debtor entities,

12

non-debtor affiliates, and the Shabsels Brothers.  The DAMIS Debtors estimate that approximately

$134 million in MCA Obligations remained outstanding as of the Petition Date.

###### D.   General Unsecured Obligations.

24.      As of the Petition Date, the DAMIS Debtors estimate that they have approximately

$52 million in outstanding unsecured obligations (collectively, the "Prepetition Unsecured

Obligations"), which consist primarily of amounts due to trade vendors and other creditors, as well

as loans extended by various individuals to certain of the DAMIS Debtors on an unsecured basis,

many of which are personally guaranteed by the Shabsels Brothers.  The DAMIS Debtors intend

to refine the estimated amount of Prepetition Unsecured Obligations due and owing as of the

Petition Date in connection with the preparation of their schedules of assets and liabilities and

statements of financial affairs.

###### E.   Equity Interests in DAMIS Holdings LLC.

25.      As of the Petition Date, Mr. David Shabsels and Mr. Michael Shabsels each held

50% of the outstanding limited liability company interests of DAMIS Holdings LLC.

### III.   Events Preceding the Chapter 11 Cases.

26.      The chapter 11 proceedings of certain of the SIMAD Debtors were precipitated by

a default under a publicly held bond issuance of the SIMAD Debtors (the "SIMAD Debentures")

following their failure to make a scheduled interest payment on May 31, 2026.  Recognizing that

they would be unable to satisfy their funded-debt obligations and avoid extensive operational

disruption without filing for chapter 11 protection, the SIMAD Debtors and the DAMIS Debtors

commenced their chapter 11 cases on June 4, 2026.

27.      As of the Petition Date, the DAMIS Debtors' cash on hand had declined to a level

far below the amounts necessary to satisfy near-term debt-service obligations under the Mortgages,

13

fund payroll, and other crucial operating expenses. (As of the date of this Declaration, the DAMIS Debtors have approximately $10.3 million in cash on hand—an amount still inadequate to fund debt-service payments and operating expenses.) In addition, certain of the Mortgage Loan Documents and the MCA Agreements contain cross-guaranties and/or cross-default provisions that, if triggered by the SIMAD Debtors' default under the SIMAD Debentures, defaults under the SIMAD Debtors' merchant cash advance arrangements, or the Shabsels Brothers both seeking bankruptcy protection, could have enabled Mortgage Lenders and MCA Lenders to exercise remedies against the DAMIS Debtors outside the chapter 11 context. Given the extensive intercompany relationships and obligations among the DAMIS Debtors, the SIMAD Debtors, and their non-debtor affiliates, commencing the Chapter 11 Cases was necessary to avoid catastrophic business disruption and a potentially enterprise-wide inability to access cash.

28. Further, upon information and belief, certain of the DAMIS Debtors had defaulted on their MCA Obligations in the days immediately before the Petition Date. In order to recover amounts owed, several MCA Lenders exercised their rights under the applicable MCA Agreements and began sweeping cash from certain of the DAMIS Debtors' bank accounts. In an effort to mitigate the risk that MCA Lenders would continue sweeping cash from the DAMIS Debtors' accounts in order to repay the MCA Obligations, the DAMIS Debtors appointed me as CRO and soon thereafter authorized the filing of the Chapter 11 Cases to obtain the benefit of the automatic stay and begin to address their liquidity issues through an orderly, transparent, court-supervised process.

29. In the months ahead, I and the Debtor Advisors will investigate the full extent of the circumstances that led to the commencement of the Chapter 11 Cases. I anticipate that this investigation will place a significant emphasis on prepetition intercompany transactions between

the DAMIS Debtors, the SIMAD Debtors, their non-debtor affiliates, the Shabsels Brothers, and the Non-Debtor Fee Holders, among other parties, as well as any misconduct that may have occurred in connection with any such transactions. As additional information becomes available, the DAMIS Debtors will provide the Court and parties in interest with further updates as soon as reasonably practicable.

## IV.    Postpetition Efforts and Objectives of the Chapter 11 Cases.

30.    Since my appointment as CRO on the Petition Date, I have been working diligently, together with the Debtor Advisors, to assess the operational and financial condition of each of the ninety (90) DAMIS Debtors and their Assets. Given the free-fall nature of the Chapter 11 Cases— in which no prepetition restructuring negotiations were concluded and no plan support agreement was in place as of the Petition Date—my immediate priority has been to stabilize operations and conduct a comprehensive assessment of the Assets, which encompass retail properties, multifamily residential units, and office buildings across the United States. To that end, since the Petition Date, I and my advisors have been: (a) reviewing each DAMIS Debtor's organizational structure, governing documents, and prepetition contractual obligations, including leases, financing agreements, and encumbrances, to develop a clear understanding of each entity's legal and capital structure; (b) conducting property-level operational reviews to assess current occupancy levels, rent rolls, operating expenses, and property-level cash flows; (c) engaging with licensed appraisers and real estate professionals to conduct independent valuations of the Assets in order to assess the fair market value of each property on both a standalone and portfolio-wide basis; and (d) evaluating the operational viability of each DAMIS Debtor to determine whether individual Assets should be retained and restructured as part of a going concern or, alternatively, marketed and sold pursuant to section 363 of the Bankruptcy Code for the benefit of the DAMIS Debtors' estates and their

15

creditors. This assessment remains ongoing, and I expect to have a more fulsome view of the Assets' composition, value, and viability in the coming weeks. As described herein, the relief requested in the First Day Motions is necessary to preserve the value of the DAMIS Debtors' estates, and to provide me and my team with the tools necessary to conduct this assessment and ensure that I can fulfill my obligations as CRO during the Chapter 11 Cases.

31. As described in more depth in this section, I and the Debtor Advisors have taken several additional measures that have so far been, or will likely prove to be, critical to ensure the success of the DAMIS Debtors' restructuring efforts.

### A. Governance & Control of the DAMIS Debtors.

32. To safeguard the DAMIS Debtors' restructuring efforts, I have relieved the Shabsels Brothers of all authority over decision-making concerning the DAMIS Debtors. As of the date of this Declaration, however, I have been unable to obtain the requisite signatures from the Shabsels Brothers to relinquish their authority as signatories for the DAMIS Debtors' bank accounts. In order to protect their assets during the Chapter 11 Cases, the DAMIS Debtors therefore seek authority, through the Cash Management Motion,[6] to replace the Shabsels Brothers as signatories with respect to each of the Bank Accounts (as defined therein).

### B. Engagement of Independent Directors & Professionals.

33. Immediately prior to the Petition Date, two disinterested directors, Mr. Bernard Katz and Ms. Jill Frizzley (the "Independent Directors"), were appointed to the board of DAMIS Holdings LLC. The Independent Directors, who replaced the Shabsels Brothers in all matters

---

[6] "Cash Management Motion" means the *DAMIS Debtors' Motion for Entry of Interim and Final Orders (I) Granting Authority to (A) Continue Using the Cash Management System, Business Forms, and Books and Records and Pay All Fees Related Thereto, (B) Implement Ordinary-Course Changes to Cash Management System, Including Opening and Closing Accounts, (C) Continue Intercompany Transactions; (II) Granting Administrative Expense Status to Postpetition Intercompany Transactions; and (III) Granting Related Relief*, filed contemporaneously herewith.

16

concerning the governance of the DAMIS Debtors, are tasked with overseeing the DAMIS Debtors and ensuring independent decision-making with respect to their operations and management throughout the Chapter 11 Cases. Both Ms. Frizzley and Mr. Katz have extensive experience as board members and industry professionals and proven track records of successfully navigating distressed situations. Ms. Frizzley currently serves as a director for Trinseo Plc, and has in the past served on the boards of QVC, Inc., certain affiliates of Harvest Sherwood Food Distributors, Inc., Invitae Corporation, Virgin Orbit Holdings, Inc., Surgalign Holdings, Inc., Avaya Holdings Corporation, and Hudson Technologies, Inc. With more than 40 years of expertise in forensic accounting as well as corporate restructuring financial advisory services, Mr. Katz is similarly well positioned to oversee an independent decision-making process in the Chapter 11 Cases. Mr. Katz has served as an independent director of the boards of Modell's, Hollister Construction, George Washington Bridge Bus Station Development, DeVault Foods, Bett-A-Way Holdings, and Princeton Alternative Investment Funds, among numerous others. The appointment of the Independent Directors will ensure that the Chapter 11 Cases are administered in a transparent, disinterested manner for the benefit of the DAMIS Debtors' estates and all parties in interest.

34. Additionally, subject to Court approval, the DAMIS Debtors expect to engage one or more independent professionals to supplement the efforts of the Debtor Advisors in the weeks ahead. First, the DAMIS Debtors plan to retain an independent forensic accountant to conduct a comprehensive examination of the DAMIS Debtors' historical financial information and prepetition transactions, including intercompany transactions between the DAMIS Debtors, on the one hand, and the SIMAD Debtors, non-debtor affiliates, and entities controlled by the Shabsels Brothers, on the other. Second, the DAMIS Debtors intend to engage a strategic real estate consultant to provide appraisals as necessary to assist the DAMIS Debtors in a strategic review of

their portfolio.  The DAMIS Debtors anticipate that robust, independent valuations conducted by an advisory firm specializing in real estate transactions will prove essential in charting a path forward in the Chapter 11 Cases, and the DAMIS Debtors continue to explore potential candidates as of the date of this Declaration.

### C.   Automatic Stay Violations.

35.     Among the DAMIS Debtors' most urgent priorities in the initial phase of the Chapter 11 Cases is addressing the numerous violations of the automatic stay that MCA Lenders have committed since the Petition Date.  Over the past several weeks, notwithstanding the automatic stay that took effect upon the commencement of the Chapter 11 Cases, various MCA Lenders have attempted to sweep cash from bank accounts of the DAMIS Debtors following purported defaults under the applicable MCA Agreements.  Certain MCA Lenders have also begun contacting tenants at the DAMIS Debtors' properties to demand that such tenants make future rent payments directly to the MCA Lenders rather than the DAMIS Debtors, as required pursuant to the terms of their respective lease agreements.

36.     To take just one example, on June 12, 2026, eight days after the commencement of the Chapter 11 Cases, the DAMIS Debtors received a *Notice of UCC Demand and Request for Accounts Receivables* (the "MMH Demand Letter") from The Merchant Marketplace Holdings ("MMH"), one of the DAMIS Debtors' MCA Lenders.  The MMH Demand Letter, which is attached as **Exhibit A** hereto, was addressed to a tenant of two of the DAMIS Debtors, Matteson Center Real Estate LLC and DAMIS Holdings LLC.  The MMH Demand Letter asserts that because of alleged defaults by Matteson Center Real Estate LLC and DAMIS Holdings LLC, the bank accounts of these DAMIS Debtors "now belong to The Merchant Marketplace Holdings," and instructs the tenant to "put a hold on any funds owed and not remit them to Matteson Center

18

Real Estate LLC; Damis Holdings LLC [*sic*], and to instead pay those funds directly to The Merchant Marketplace Holdings." MMH Demand Letter at 1. On June 17, 2026, the DAMIS Debtors sent a letter to MMH via email (and by overnight mail on the following day) notifying MMH that such attempts to collect on any claims against the DAMIS Debtors constitute violations of the automatic stay. Faegre Drinker, as proposed counsel to the DAMIS Debtors, separately contacted counsel to MMH via email on June 17, 2026, but as of the date of this Declaration, the DAMIS Debtors have not received a response from either MMH or its counsel.

37.    The DAMIS Debtors sent similar correspondence to all of the MCA Lenders on June 17, 2026, notifying the MCA Lenders that any attempts to debit the DAMIS Debtors' bank accounts or otherwise collect amounts allegedly owed by the DAMIS Debtors constitute violations of the automatic stay and formally demanding that any and all amounts debited from the DAMIS Debtors' bank accounts since the Petition Date be returned immediately. In addition, with the assistance of Kroll Restructuring Administration LLC ("Kroll"), the DAMIS Debtors' proposed claims and noticing agent, the DAMIS Debtors provided notice to more than 300 tenants at Properties owned or leased by DAMIS Debtors that are party to MCA Agreements that all tenants of the DAMIS Debtors remain obligated to make rent payments to the DAMIS Debtors, and that under no circumstances should tenants withhold or redirect rent payments pursuant to demands received from any MCA Lenders.[7]

38.    The DAMIS Debtors have provided the MCA Lenders with notice of the Chapter 11 Cases that is more than sufficient to alert them to the scope and applicability of the automatic stay. Since the Petition Date, however, certain MCA Lenders continue to attempt to effect sweeps of the DAMIS Debtors' bank accounts and/or contact the DAMIS Debtors' tenants

---

[7] The DAMIS Debtors anticipate that affidavits of service concerning the notices described in this paragraph will be filed on the Court's docket substantially contemporaneously with this Declaration.

to demand that tenants direct future rent payments to the MCA Lenders rather than the DAMIS Debtors. Every such cash sweep further undercuts the DAMIS Debtors' liquidity position and jeopardizes their ability to sustain ordinary-course operations, and each attempt to redirect rent payments creates confusion among the DAMIS Debtors' tenant base. The postpetition conduct of certain MCA Lenders has required that the DAMIS Debtors expend significant time and resources in communicating with banks where the DAMIS Debtors maintain operating accounts to ensure that further cash sweeps do not occur, and with tenants at their various Properties, rather than fully devoting their time and energy to the efficient administration of the Chapter 11 Cases.

39.    Contemporaneously with this Declaration, the DAMIS Debtors have filed a motion seeking an order restating and enforcing the automatic stay, in hopes of providing additional clarity to the MCA Lenders and all parties in interest with respect to the reach and applicability of the automatic stay in the Chapter 11 Cases. The DAMIS Debtors will pursue all available remedies to prevent any further unilateral attempts by MCA Lenders to recover amounts allegedly due and owing under the MCA Agreements during the Chapter 11 Cases, including, if necessary, seeking orders compelling the return of any and all funds improperly removed from the DAMIS Debtors' bank accounts and moving for the imposition of sanctions related to violations of the automatic stay.

**D.    Preservation of Vendor Relationships.**

40.    The DAMIS Debtors depend on a large number of vendors, suppliers, and service providers to operate in the ordinary course of business. These vendors provide the DAMIS Debtors with a range of goods, materials, and services, including food, supplies, maintenance, staffing, and logistics. Since the Petition Date, the DAMIS Debtors have received numerous communications from vendors expressing concern about the DAMIS Debtors' ability to pay amounts due and owing

20

for services rendered prior to the Chapter 11 Cases. In addition, certain of these parties have indicated that they may cease performing absent prompt payment of amounts owed by the DAMIS Debtors.

41. In order for the DAMIS Debtors to assure their tenants, guests, and employees that they will be able to continue operating in the ordinary course and providing the same quality of service that their stakeholders have come to expect, it is imperative that the DAMIS Debtors maintain uninterrupted access to the full suite of products and services required in the operation of their businesses. Any disruption in the provision of critical goods and services by the DAMIS Debtors' vendor partners would have extensive, adverse economic and operational consequences for the DAMIS Debtors' ability to continue operating in the ordinary course during the Chapter 11 Cases. Preserving vendor relationships is therefore among the DAMIS Debtors' highest priorities in the Chapter 11 Cases, as described more fully in the *DAMIS Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the DAMIS Debtors to Pay Certain Prepetition Claims of Critical Vendors and Service Providers; (II) Authorizing the Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto; and (III) Granting Related Relief*, filed contemporaneously herewith.

**E.      Long-Term Chapter 11 Objectives.**

42. As the Chapter 11 Cases progress, the DAMIS Debtors intend to work tirelessly to build support among their various stakeholders for one or more value-maximizing transactions. Given the minimal amount of cash on hand, the DAMIS Debtors will likely require access to additional liquidity to effectively administer the Chapter 11 Cases. While the DAMIS Debtors and the Debtor Advisors work toward developing consensus on a path forward in the Chapter 11 Cases, the DAMIS Debtors hope to negotiate the consensual use of cash collateral with all or some

of the Mortgage Lenders that maintain security interests in cash received by the DAMIS Debtors in the form of rental income, hotel and resort revenues, and other proceeds generated by the Assets. In parallel with these discussions, the Debtor Advisors intend to explore all available options to address the DAMIS Debtors' liquidity needs, including but not limited to debtor-in-possession financing, potential sales of Assets that retain equity value, and other transactions.

## V. Evidentiary Support for First Day Motions.

43. Substantially contemporaneously with the filing of this Declaration, the DAMIS Debtors have filed a number of First Day Motions seeking various forms of administrative and operational relief that are urgently needed in order to minimize the adverse effects of the Chapter 11 Cases on the DAMIS Debtors' ability to continue operating in the ordinary course of business. I have reviewed each of the First Day Motions and, to the best of my knowledge, the assertions of fact contained therein are true and accurate. Further, I believe that the relief sought therein is necessary and in the best interests of the DAMIS Debtors' estates, as it will allow the DAMIS Debtors to limit operational disruption during the Chapter 11 Cases while they work toward a value-maximizing transaction. The requests for immediate relief in the First Day Motions have been carefully tailored, especially in light of the circumstances of the Chapter 11 Cases, to such relief as is necessary to avoid immediate and irreparable harm to the DAMIS Debtors' estates.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: June 24, 2026

*/s/ Perry Mandarino*_____
Perry Mandarino

**Exhibit A**

**MMH Demand Letter**

LAW OFFICES OF

# REGENT & ASSOCIATES

500 LOVETT BLVD., SUITE 225
HOUSTON, TEXAS 77006

Anh H. Regent
aregent@regentlawfirm.com

(713) 589-5692 TELEPHONE
(713) 456-2288 FACSIMILE

June 12, 2026

The TJX Companies, Inc.
770 Cochituate Road
Framingham, MA 01701

# NOTICE OF UCC DEMAND AND REQUEST FOR
# ACCOUNTS RECEIVABLES

RE:    **The Merchant Marketplace Holdings v. Matteson Center Real Estate LLC;
Damis Holdings LLC & Michael Shabsels**, located at 50 Quality St #110357,
Trumbull, CT 06611.

**FEIN: 87-3059813**
**SSN for Michael Shabsels: xxx-xx-2241**

To Whom It May Concern:

This law firm represents The Merchant Marketplace Holdings. We understand that your company has a business relationship with Matteson Center Real Estate LLC; Damis Holdings LLC and Michael Shabsels. Matteson Center Real Estate LLC; Damis Holdings LLC is in default on a purchase agreement to The Merchant Marketplace Holdings. That agreement is secured by a security interest in all the accounts and accounts receivables of Matteson Center Real Estate LLC; Damis Holdings LLC (a copy of the security agreement and filed UCC are attached hereto).

Because of Matteson Center Real Estate LLC; Damis Holdings LLC's default, all its accounts now belong to The Merchant Marketplace Holdings. Therefore, under UCC Section 9-406, demand is hereby made upon you to put a hold on any funds owed and not remit them to Matteson Center Real Estate LLC; Damis Holdings LLC, and to instead pay those funds directly to The Merchant Marketplace Holdings. Under the UCC, once my client has given you formal notice under the UCC of its enforcement of its security interest, and accurately identified the collateral, (*See* UCC Section 9-607(a)), you may discharge your obligation by paying my client and "***may not discharge the obligation by paying the assignor*** [Matteson Center Real Estate LLC; Damis Holdings LLC]" (UCC 9.406(a)). Therefore, the UCC requires you to pay any accounts receivables to my client and **not** pay them to Matteson Center Real Estate LLC; Damis Holdings LLC.

If you want to conduct an investigation into this matter, or further review the requirements under the UCC, I suggest you put a hold on those funds and put them into a separate reserve or trust account pending your investigation.

Matteson Center Real Estate LLC; Damis Holdings LLC currently owes The Merchant Marketplace Holdings $637,811.99.

If you any questions, feel free to contact me at the above referenced numbers, or email me.

Very truly yours,

REGENT & ASSOCIATES

By:  Anh H. Regent, Esq.